**SUPERIOR COURT OF WASHINGTON FOR KING COUNTY**

Randy A. Norberg and
Alexanderia A. Norberg,
Plaintiffs,

v.

PennyMac Loan Services, LLC, a Delaware limited liability company; and Does 1-20,
Defendants.

Case No. 26-2-20910-3 SEA

**FIRST AMENDED VERIFIED COMPLAINT FOR QUIET TITLE, DECLARATORY RELIEF, INJUNCTIVE RELIEF, EQUITABLE ACCOUNTING, FRAUDULENT INDUCEMENT, FRAUD BY CONCEALMENT, FRAUDULENT MISREPRESENTATION, NEGLIGENT MISREPRESENTATION, VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, SERVICING-RELATED RELIEF, SLANDER OF TITLE, AND EVIDENCE PRESERVATION**

Plaintiffs Randy A. Norberg and Alexanderia A. Norberg allege as follows:

## I. PARTIES

1. Plaintiff Randy A. Norberg is a natural person residing in King County, Washington.

2. Plaintiff Alexanderia A. Norberg is a natural person residing in King County, Washington.

3. Plaintiffs are husband and wife and are the owners of the real property commonly known as 14517 Macadam Rd S, Tukwila, Washington 98168.

4. Defendant PennyMac Loan Services, LLC ("PennyMac") is, on information and belief, a foreign limited liability company doing business in Washington and at all relevant times acted as lender, servicer, beneficiary-related entity, claimant, or controlling mortgage actor with respect to the loan and refinance transactions at issue.

5. Plaintiffs do not presently know the true names and capacities of Defendants sued herein as Does 1-20 and therefore sue such Defendants by fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each Doe Defendant was responsible in some manner for the events and injuries alleged herein, including participation in origination, settlement, title handling, escrow, servicing, recording, communications, or related conduct connected to the transactions at issue. Plaintiffs will amend this Complaint to allege the true names and capacities of such Defendants when ascertained.

6. At all times relevant herein, each Defendant was the agent, servant, employee, partner, alter ego, affiliate, representative, co-venturer, successor, or joint participant of each other Defendant and, in doing the things alleged herein, acted within the course and scope of such relationship, or knowingly aided, ratified, directed, approved, or benefited from the conduct alleged.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action because it concerns real property located in King County, Washington; claims arising under Washington law; requests for declaratory and injunctive relief; and monetary and equitable relief within the jurisdiction of this Court.

8. Venue is proper in King County because the Property is located in King County, the events complained of occurred in substantial part in King County, and the disputed instruments affect title to real property located in King County.

## III. THE PROPERTY

9. The Property at issue is commonly known as 14517 Macadam Rd S, Tukwila, Washington 98168.

10. The Property includes two tax parcels: Parcel A, Tax Account No. 7999600030, and Parcel B, Tax Account No. 7999600031. See Ex. A.1-A.4.

11. Plaintiffs acquired title to the Property in connection with the June 2024 purchase transaction. See Ex. A.1.

12. The January 2026 refinance deed of trust later recorded against the Property is disputed by Plaintiffs, including as to whether Parcel A was knowingly and validly encumbered. See Ex. A.2-A.4.

## IV. GENERAL ALLEGATIONS

13. This action arises from material discrepancies, altered or inconsistent loan and settlement records, disputed collateral treatment, unreliable servicing and payment reporting, missing call

recordings, portal record-integrity issues, and a disputed deed of trust affecting title to the Property, including Parcel A.

14. Plaintiffs were first-time homebuyers and relied on the information, instructions, disclosures, documents, and representations provided during the June 2024 purchase transaction and the January 2026 refinance transaction.

15. Plaintiffs did not knowingly consent to any undisclosed, altered, or inconsistently presented collateral treatment affecting Parcel A. See Ex. A.1-A.4, Ex. C.5, Ex. D.1-D.3, Ex. J.1-J.2.

16. Plaintiffs were provided no review at all of the operative deed-of-trust and collateral documents before the January 2026 refinance closed. See Ex. A.2-A.4, Ex. C.4-C.5, Ex. D.1-D.3, Ex. L.1-L.2.

17. Plaintiffs did not knowingly agree that Parcel A would be encumbered under the January 2026 refinance deed of trust. See Ex. A.1-A.4, Ex. D.1-D.3, Ex. L.1-L.2.

18. During the June 2024 purchase transaction, Plaintiffs likewise were not fairly or accurately presented with the operative collateral and settlement terms later asserted against them.

19. At the June 20, 2024 signing, the deed document shown to Plaintiffs was the statutory warranty deed.

20. Plaintiffs did not knowingly review or approve later-altered, substituted, or inconsistently presented operative collateral documents.

21. Plaintiffs retained copies of transaction documents during the purchase and refinance process. The June 20, 2024 Closing Disclosure retained by Plaintiffs is included as Ex. B.1.

22. Later, when Plaintiffs compared copies they had retained to versions later displayed in the PennyMac portal, Plaintiffs observed numerous differences and apparent alterations. The later portal version is included as Ex. B.2, and a comparison chart is included as Ex. B.3.

23. Plaintiffs are informed and believe that there are approximately 27 differences between the June 2024 Closing Disclosure retained by Plaintiffs and the later portal version. See Ex. B.1-B.3.

24. Those differences included material changes to dates, payment figures, settlement figures, seller-side accounting figures, financed amounts, total-interest-percentage figures, escrow figures, commissions, and other core transaction terms. See Ex. B.1-B.3.

25. By way of example, Plaintiffs' retained June 2024 Closing Disclosure showed a closing date of June 20, 2024, while a later portal version showed June 18, 2024. See Ex. B.1-B.2.

26. Plaintiffs' retained version showed a total monthly payment of $4,139.83, while a later portal version showed $4,153.02. See Ex. B.1-B.2.

27. Plaintiffs' retained version reflected a real estate commission entry of $25,188.97 and seller-paid commissions including a line for Specialty Real Estate Group, while the later portal version differed. See Ex. B.1-B.2.

28. Plaintiffs' retained June 2024 Closing Disclosure reflected cash to close of $62,917.16 and total due from borrower at closing of $612,501.16. See Ex. B.1.

29. A later portal version instead reflected cash to close of $50,996.37 and total due from borrower at closing of $600,580.37. See Ex. B.2.

30. Plaintiffs further observed that seller-side figures materially changed between versions. See Ex. B.1-B.3.

31. In the retained version, due from seller at closing appeared as $312,966.64 and seller receipt appeared as $267,170.47. See Ex. B.1.

32. In the later portal version, due from seller at closing appeared as $32,968.94 and seller receipt appeared as $547,294.43. See Ex. B.2.

33. Plaintiffs also observed changes in the amount financed, total interest percentage, and escrow-related figures between versions. See Ex. B.1-B.2.

34. For example, Plaintiffs' retained version reflected amount financed of $519,996.37 and total interest percentage of 130.711%, while a later version reflected amount financed of $519,016.37 and total interest percentage of 130.748%. See Ex. B.1-B.2.

35. Both versions reviewed by Plaintiffs showed the box marked that the loan did not have a negative amortization feature. See Ex. B.1-B.2.

36. Even so, the accounting, payment, and principal figures later reviewed by Plaintiffs did not reconcile in a way Plaintiffs could understand or trust. See Ex. B.1-B.3, Ex. G.1-G.4, Ex. I.1-I.5.

37. During and after the refinance period, Plaintiffs experienced portal-access interruptions and lockouts affecting their PennyMac account. See Ex. E.1-E.4.

38. After access was restored, records appearing in the portal were not consistent with documents Plaintiffs had previously copied, retained, or expected to see. See Ex. E.1-E.4.

39. Records relating to closing, escrow, insurance, dates, amounts, and other loan information appeared changed, missing, or different in content. See Ex. E.1-E.4.

40. These portal-access interruptions and apparent changes caused Plaintiffs to question the integrity and reliability of the account history and portal records. See Ex. E.1-E.4, Ex. L.1-L.2.

41. Plaintiffs are informed and believe that underlying metadata, audit trails, portal logs, and related electronically stored information will show when records were created, modified, replaced, uploaded, removed, or displayed.

42. Plaintiffs allege that such electronically stored information is relevant and must be preserved. See Ex. E.1-E.4, Ex. J.1-J.5.

43. With respect to the January 2026 refinance, PennyMac, directly and through its representatives, represented that the transaction would produce a materially lower monthly payment and a meaningful financial benefit to Plaintiffs. See Ex. C.1-C.5, Ex. L.1.

44. Instead, the reduction from the original payment was only approximately $53. See Ex. B.1, Ex. C.2-C.3.

45. That reduction did not match the benefit represented to Plaintiffs. See Ex. C.1-C.5, Ex. L.1.

46. Plaintiffs observed that on the original loan approximately $3,419.80 went to principal and interest. See Ex. B.1, Ex. I.3, and supporting payment/account records.

47. Plaintiffs observed that on the refinance approximately $3,254.54 went to principal and interest. See Ex. C.3, Ex. G.2-G.4.

48. Based on what Plaintiffs were told, what they later reviewed, and what they paid, the refinance did not appear to provide the meaningful benefit represented. See Ex. C.1-C.5, Ex. F.1-F.4, Ex. G.1-G.4, Ex. L.1.

49. Plaintiffs observed refinance figures that appeared inconsistent, inflated, and not properly reconciled. See Ex. C.1-C.5, Ex. F.1-F.4, Ex. G.1-G.4, Ex. I.1-I.5.

50. Those figures included total closing costs of $19,721.99. See Ex. C.3.

51. Those figures further included an escrow cushion requirement of $3,420.92. See Ex. C.3, Ex. I.4.

52. Plaintiffs also observed that PennyMac was listed to pay off the existing mortgage in the amount of approximately $532,972.54, even though other amount-financed and principal-balance figures did not reconcile with that amount. See Ex. C.2-C.3, Ex. G.1-G.4, Ex. H.1, Ex. I.1-I.2.

53. Plaintiffs reviewed escrow activity that appeared to show a surplus of $3,917.72. See Ex. I.4.

54. At the same time, Plaintiffs were being charged insurance and escrow amounts that did not make sense and appeared inflated, duplicative, or otherwise inconsistent with prior representations and account history. See Ex. I.4-I.5, Ex. C.5.

55. PennyMac, through its representative Drew Goodrow, represented to Plaintiffs by phone and text that Plaintiffs' payment would decrease further once duplicated insurance issues were corrected. See Ex. C.5.

56. Plaintiffs also received and retained communications reflecting different proposed refinance terms, including a monthly-payment figure of $3,940.49 paired with a cash-to-close figure of $5,739.08. See Ex. C.5.

57. Plaintiffs were also told that cash to close would be about the same as Plaintiffs' regular monthly payment. See Ex. C.5, Ex. L.1.

58. The final transaction terms did not match those representations. See Ex. C.1-C.5, Ex. F.1-F.3.

59. Plaintiffs have identified at least three refinance closing disclosures and are informed and believe that additional versions exist. See Ex. C.1-C.5.

60. Those versions reflected different prices, payment figures, dates, and closing terms. See Ex. C.1-C.5.

61. Plaintiffs were sent another closing disclosure on January 27, 2026 and then another after the deed had already been recorded. See Ex. C.3-C.4, Ex. D.1-D.2.

62. Plaintiffs did not see the operative deed-of-trust language affecting title until after recording. See Ex. A.2-A.3, Ex. D.1, Ex. L.1-L.2.

63. After finally seeing the recorded deed, Plaintiffs refused to continue reviewing or signing additional loan documents without legal review. See Ex. D.1-D.3, Ex. L.1-L.2.

64. On or about March 11, 2026, Plaintiffs communicated that they would not review any further documents until a lawyer had reviewed them. See Ex. D.1.

65. In January 2026, Plaintiffs had telephone communications with PennyMac representatives, including Drew Goodrow, concerning the refinance, deed language, payment timing, and whether January or February payments needed to be made before the refinance took effect. See Ex. C.5, Ex. J.3-J.5, Ex. L.1.

66. Plaintiffs raised concerns during those calls and relied on what they were told. See Ex. J.3-J.5, Ex. L.1.

67. PennyMac represented that Plaintiffs did not need to worry about certain payments in the manner PennyMac later treated those months. See Ex. F.2-F.3, Ex. J.3-J.5, Ex. L.1.

68. Plaintiffs were instructed regarding the cashier's-check amount to bring to closing. See Ex. C.5, Ex. F.1-F.3, Ex. L.1.

69. Plaintiffs brought a cashier's check of approximately $1,631 as instructed. See Ex. F.1.

70. Plaintiffs also had paperwork stating that the first payment on the refinance loan was due March 1, 2026. See Ex. F.2.

71. Plaintiffs relied on those representations and documents. See Ex. C.5, Ex. F.1-F.3, Ex. L.1.

72. Later, when Plaintiffs requested records and call materials relating to the dispute, the production received from PennyMac did not include all January 2026 call recordings that Plaintiffs believe should exist. See Ex. J.1-J.5.

73. The omitted calls concern the critical refinance period, including deed language, payment timing, Plaintiffs' objections, and representations made to Plaintiffs. See Ex. J.3-J.5, Ex. L.1-L.2.

74. Those omitted recordings bear directly on whether Plaintiffs knowingly agreed to the refinance terms, whether Plaintiffs were given any review of the operative collateral documents, and whether PennyMac accurately instructed Plaintiffs about payment obligations and closing requirements. See Ex. J.3-J.5.

75. Plaintiffs have also reviewed credit-reporting and account materials showing reporting that Plaintiffs allege was false or inconsistent. See Ex. H.1-H.3.

76. Plaintiffs possess documents showing the first payment on the original loan was due August 1, 2024. See Ex. F.2, Ex. G.1.

77. Despite that, Plaintiffs later saw reporting reflecting a missed scheduled payment in July 2024. See Ex. H.1-H.2.

78. Plaintiffs also observed later reporting for November 2024, February 2025, and May 2025 showing $0 payments. See Ex. H.1-H.2.

79. That reporting did not match Plaintiffs' payment history and understanding of what had been paid. See Ex. F.4, Ex. G.1-G.4, Ex. H.1-H.2, Ex. L.1.

80. Plaintiffs also reviewed payoff and principal figures that did not reconcile. See Ex. G.1-G.4, Ex. H.1-H.2, Ex. I.1-I.3.

81. For example, Plaintiffs observed a payoff amount reported near the time of refinance of approximately $532,972, while statement information reflected an unpaid principal balance of $525,709.66 as of February 1, 2026. See Ex. G.1-G.4, Ex. H.1, Ex. I.1-I.2.

82. Plaintiffs allege that charges, fees, late-treatment entries, escrow manipulation, and other unexplained additions improperly increased the larger figure. See Ex. G.1-G.4, Ex. I.4-I.5.

83. In December 2025, Plaintiffs contacted PennyMac and were told on a recorded line that if payment was made by the 30th, Plaintiffs would not be reported late and no fee would be charged. See Ex. J.5, Ex. L.1.

84. Plaintiffs made that payment before the 30th. See Ex. F.4, Ex. G.1-G.2.

85. Nevertheless, PennyMac later treated payment history and delinquency status in a manner inconsistent with those representations and with the refinance first-payment documentation. See Ex. F.2-F.4, Ex. G.1-G.4, Ex. H.1-H.2.

86. Plaintiffs also reviewed annual tax reporting forms from PennyMac that increased Plaintiffs' concerns regarding principal application, mortgage insurance treatment, and accounting integrity. See Ex. I.1-I.5.

87. Plaintiffs' 2024 Form 1098 reflected a principal balance still tracking the original loan amount and mortgage insurance premiums of $10,491.51. See Ex. I.1.

88. Plaintiffs' 2025 Form 1098 reflected outstanding principal of $531,701.79, mortgage interest received of $35,045.47, and mortgage insurance premiums of $2,381.63. See Ex. I.2.

89. Plaintiffs allege those figures do not reconcile with the amortization information, payment history, and principal reduction that should have occurred. See Ex. G.1-G.4, Ex. I.1-I.5.

90. Based on the records reviewed to date, Plaintiffs allege that principal that should have been reduced was not properly reflected, including approximately $1,900.51 in 2024 and approximately $6,473.83 in 2025. See Ex. I.1-I.3.

91. Plaintiffs further allege that they contributed more than $90,000 toward the purchase transaction, including substantial funds reflected through bank and transaction records that were not transparently or consistently accounted for in the documents later displayed or relied upon by PennyMac. See Ex. K.1-K.4.

92. Plaintiffs demand a full escrow and settlement ledger showing every dollar received and disbursed in the purchase and refinance transactions. See Ex. I.4-I.5, Ex. J.1-J.2, Ex. K.1-K.4.

93. That accounting must include all wires, checks, cashier's checks, deposits, refunds, credits, title premiums, insurance payments, payoff amounts, lender credits, suspense entries, escrow adjustments, commissions, and all other debits or credits affecting the account. See Ex. F.1-F.4, Ex. G.1-G.4, Ex. I.1-I.5, Ex. K.1-K.4.

94. Plaintiffs allege that the records produced to date do not provide a full, transparent, or reliable accounting. See Ex. J.1-J.2.

95. An actual and justiciable controversy exists concerning the validity, scope, and enforceability of the January 2026 refinance deed of trust, including whether Parcel A was ever knowingly and validly encumbered. See Ex. A.1-A.4, Ex. D.1-D.3, Ex. J.1-J.2, Ex. L.1-L.2.

96. Plaintiffs allege they did not knowingly consent to Parcel A being pledged as collateral, were given no review at all of the operative deed-of-trust language before closing, and later discovered material inconsistencies between the recorded instrument, title-related documents, closing disclosures, account records, and other transaction materials presented or later displayed by PennyMac. See Ex. A.1-A.4, Ex. B.1-B.3, Ex. C.1-C.5, Ex. D.1-D.3, Ex. E.1-E.4, Ex. J.1-J.2, Ex. L.1-L.2.

97. As a direct and proximate result of PennyMac's acts and omissions, Plaintiffs have suffered and continue to suffer monetary loss, title impairment, credit harm, loss of equity, loss of use of Parcel A, disruption of development and income plans, out-of-pocket costs, business interruption, and severe family hardship. See Ex. H.1-H.3, Ex. I.1-I.5, Ex. K.1-K.4, Ex. L.1-L.2.

98. Plaintiffs contributed substantial funds toward the Property, personally performed substantial labor improving it, and were forced to divert time and resources away from work and family in order to challenge inaccurate records, disputed lien claims, and threatened loss of their home. See Ex. K.1-K.4, Ex. L.1-L.2.

99. Absent injunctive and preservation relief, Plaintiffs face continuing irreparable harm, including clouded title, impaired marketability of Parcel A, continued false or inconsistent servicing and credit reporting, loss or alteration of electronically stored evidence, and risk of enforcement activity based on disputed and unreliable records. See Ex. A.2-A.4, Ex. E.1-E.4, Ex. H.1-H.2, Ex. J.1-J.5, Ex. L.1-L.2.

100. Plaintiffs submitted a complaint to the Consumer Financial Protection Bureau ("CFPB") on May 12, 2026, Complaint No. 260512-32588647. On or about May 14, 2026, the Washington State Department of Financial Institutions acknowledged Plaintiffs' related complaint against PennyMac and assigned Complaint No. 061940.

101. On July 10, 2026, PennyMac responded to the CFPB complaint, and the CFPB closed the complaint with explanation. In that response, PennyMac represented that on December 16, 2025 Plaintiffs received an Affiliated Business Arrangement ("AfBA") disclosure statement as part of the initial disclosure package and electronically signed and acknowledged it the same day, and enclosed what it described as the electronically signed AfBA disclosure statement.

102. Plaintiffs deny receiving or knowingly signing any AfBA disclosure on December 16, 2025. Plaintiffs' loan representative, Drew Goodrow, did not raise the use of Townsgate Closing Services as an alternate title or closing provider until days after December 16, 2025, on a recorded line, and Plaintiffs received no communication identifying an AfBA disclosure for signature on December 16, 2025.

103. Plaintiffs have identified metadata inconsistencies in electronically produced records relating to the refinance. One file, presented as loan application material, bears an internal document title of "Order Details" and an internal creation date of March 19, 2026, approximately seven weeks after the January 27, 2026 closing. A second file, labeled as a Loan Estimate dated January 3, 2026 and containing an electronic signature field structure, bears an internal creation date of June 15, 2026, approximately five months after the date it purports to represent and after

this action and Plaintiffs' CFPB complaint were underway. By comparison, a loan application file generated by Defendant's document system bears an internal creation date of December 16, 2025, the actual application date, illustrating that authentic contemporaneous records carry contemporaneous creation dates. These discrepancies bear on the reliability of the records Defendant has produced, displayed, or relied upon, and on Plaintiffs' claims for evidence preservation.

104. Plaintiffs attach representative supporting documents as grouped Exhibits A through L, including subparts, and incorporate those exhibits by reference.

## V. FIRST CAUSE OF ACTION

### Quiet Title

### Against Defendants PennyMac Loan Services, LLC, and Does 1-20

105. Plaintiffs repeat and reallege paragraphs 1 through 104 as if fully set forth herein.

106. Plaintiffs are the owners of the Property, including Parcel A and Parcel B. See Ex. A.1-A.4.

107. Defendants claim or may claim an adverse interest in the Property by virtue of the January 2026 refinance deed of trust, including as to Parcel A. See Ex. A.2-A.4.

108. An actual controversy exists concerning whether Parcel A was ever knowingly, validly, and enforceably encumbered under the refinance deed of trust. See Ex. A.1-A.4, Ex. D.1-D.3, Ex. L.1-L.2.

109. Plaintiffs did not knowingly consent to any undisclosed, altered, or inconsistently presented collateral treatment affecting Parcel A. See Ex. A.1-A.4, Ex. D.1-D.3, Ex. L.1-L.2.

110. Plaintiffs were provided no review at all of the operative deed-of-trust and collateral documents before the refinance closed. See Ex. A.2-A.4, Ex. C.4-C.5, Ex. D.1-D.3, Ex. L.1-L.2.

111. Plaintiffs later discovered material inconsistencies between the recorded instrument, title-related documents, closing disclosures, portal records, and other transaction materials relied upon by PennyMac. See Ex. A.1-A.4, Ex. B.1-B.3, Ex. C.1-C.5, Ex. E.1-E.4.

112. By reason of the foregoing, Defendants' claimed lien or adverse interest against Parcel A is disputed, invalid in whole or in part, or unenforceable in the manner asserted.

113. Plaintiffs are entitled to judgment quieting title as against Defendants' adverse claims to the extent proven at trial and declaring the true scope, validity, and enforceability of the disputed refinance deed of trust.

## VI. SECOND CAUSE OF ACTION

### Declaratory Relief

### Against Defendants PennyMac Loan Services, LLC, and Does 1-20

114. Plaintiffs repeat and reallege paragraphs 1 through 113 as if fully set forth herein.

115. An actual and justiciable controversy exists between Plaintiffs and Defendants concerning the parties' rights, duties, and interests with respect to:

a. the validity, scope, and enforceability of the January 2026 refinance deed of trust;

b. whether Parcel A was knowingly and validly encumbered;

c. the legal effect of inconsistencies between the recorded deed-of-trust materials and related transaction records;

d. the accuracy of the payoff, escrow, insurance, payment-application, and settlement accounting;

e. the accuracy and legal effect of PennyMac's servicing and credit reporting; and

f. the obligation to preserve metadata, portal logs, call recordings, and other electronically stored information relevant to these disputes.

116. Plaintiffs contend that Defendants' claimed collateral position, accounting, servicing treatment, and related records are materially inaccurate, inconsistent, incomplete, or unenforceable as asserted.

117. Plaintiffs seek declaratory relief determining the true rights and duties of the parties concerning the Property, the disputed deed of trust, the accounting, the servicing records, and related evidence-preservation obligations.

## VII. THIRD CAUSE OF ACTION

### Injunctive Relief

### Against Defendants PennyMac Loan Services, LLC, and Does 1-20

118. Plaintiffs repeat and reallege paragraphs 1 through 117 as if fully set forth herein.

119. Plaintiffs face immediate and irreparable harm absent injunctive relief.

120. Such harm includes clouded title, impaired marketability of Parcel A, inability to safely deal with the Property, continued reliance on disputed and unreliable records, continued false or inconsistent servicing and credit reporting, and potential enforcement activity based on contested collateral claims.

121. Plaintiffs have also alleged and observed portal lockouts, apparent changes in displayed records, omissions from Defendants' production, and missing January 2026 call recordings. See Ex. E.1-E.4, Ex. J.1-J.5.

122. Monetary damages alone are not an adequate remedy because they cannot fully protect Plaintiffs against threatened loss of property rights, title impairment, evidentiary loss, or enforcement based on disputed records.

123. The balance of equities favors preserving the status quo until the Court determines the true facts and legal rights of the parties.

124. Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief as necessary to preserve the status quo, prevent wrongful enforcement, prevent further reporting harm, and preserve relevant evidence.

## VIII. FOURTH CAUSE OF ACTION

### Equitable Accounting

**Against Defendants PennyMac Loan Services, LLC, and Does 1-20**

125. Plaintiffs repeat and reallege paragraphs 1 through 124 as if fully set forth herein.

126. The purchase and refinance transactions involved numerous payments, charges, credits, adjustments, escrow amounts, insurance amounts, payoff figures, commissions, refunds, and disbursements not within Plaintiffs' knowledge or control.

127. Plaintiffs have identified material inconsistencies in the purchase and refinance closing disclosures, seller-side settlement figures, escrow figures, payoff figures, insurance figures, principal balances, 1098 reporting, and payment histories. See Ex. B.1-B.3, Ex. C.1-C.5, Ex. G.1-G.4, Ex. H.1-H.2, Ex. I.1-I.5, Ex. K.1-K.4.

128. Plaintiffs have also identified materially inconsistent cash-to-close amounts, due-from-borrower amounts, due-from-seller amounts, seller-receipt amounts, escrow-cushion amounts, and payoff amounts. See Ex. B.1-B.3, Ex. C.2-C.4, Ex. I.4, Ex. K.1.

129. PennyMac and Doe Defendants possess superior knowledge and exclusive or superior control over the true accounting records, including escrow ledgers, settlement ledgers, payoff calculations, suspense entries, disbursement histories, title and premium records, and related electronic data.

130. Plaintiffs have no adequate remedy at law to reconstruct the true money trail without a full accounting.

131. Plaintiffs are entitled to a complete equitable accounting of the purchase and refinance transactions, including all wires, checks, cashier's checks, deposits, refunds, credits, commissions, title premiums, insurance payments, payoff amounts, lender credits, suspense entries, escrow adjustments, and all other debits or credits affecting the account.

## IX. FIFTH CAUSE OF ACTION

**Fraudulent Inducement, Fraud by Concealment, and Fraudulent Misrepresentation**

**Against Defendants PennyMac Loan Services, LLC, and Does 1-20**

132. Plaintiffs repeat and reallege paragraphs 1 through 131 as if fully set forth herein.

133. In connection with the January 2026 refinance transaction, PennyMac, directly and through its representative Drew Goodrow and through documents and communications provided to Plaintiffs, made and conveyed material representations concerning the refinance's expected monthly-payment benefit, cash-to-close amount, payment timing, and overall transaction terms. See Ex. C.1-C.5, Ex. F.1-F.3, Ex. L.1.

134. Plaintiffs are informed and believe, and on that basis allege, that PennyMac also controlled, directed, approved, used, or adopted the operative refinance disclosures, payoff figures, servicing communications, and collateral-related transaction records provided to Plaintiffs or later relied upon against them.

135. Among other things, Plaintiffs were told, including through communications attributed to Drew Goodrow, that the refinance would materially reduce Plaintiffs' monthly payment, that the cash-to-close amount would be approximately in line with Plaintiffs' regular monthly payment, and that the refinance would provide a meaningful financial benefit. See Ex. C.5.

136. Plaintiffs also received communications reflecting a proposed monthly-payment figure of approximately $3,940.49 paired with a cash-to-close figure of approximately $5,739.08, and were later presented with other refinance disclosures containing different figures, dates, costs, and terms. See Ex. C.1-C.5.

137. Plaintiffs were further instructed regarding the cashier's-check amount to bring to closing and proceeded in reliance on those instructions. See Ex. C.5, Ex. F.1-F.3.

138. Plaintiffs allege that these representations were material because they concerned whether to proceed with the refinance, what funds Plaintiffs needed to produce, what payment obligations would exist, and whether the refinance would provide the represented benefit.

139. Plaintiffs further allege that PennyMac failed to disclose, before closing, the operative deed-of-trust and collateral language later asserted against Plaintiffs, including the language Plaintiffs contend affected Parcel A. See Ex. A.2-A.4, Ex. D.1-D.3, Ex. L.1-L.2.

140. Plaintiffs were provided no review at all of the operative deed-of-trust and collateral documents before the refinance closed. See Ex. A.2-A.4, Ex. C.4-C.5, Ex. D.1-D.3, Ex. L.1-L.2.

141. Plaintiffs allege that the failure to disclose the operative collateral language before closing was material because a reasonable borrower would consider the actual property being encumbered, and the actual deed-of-trust language being imposed, important in deciding whether to proceed.

142. Plaintiffs further allege that multiple refinance disclosures existed, that the versions reflected materially different figures and terms, and that additional disclosure documents were sent even after the refinance deed had already been recorded. See Ex. C.1-C.4, Ex. D.1-D.2.

143. Plaintiffs also allege that the transaction records later displayed or relied upon by PennyMac were materially inconsistent with Plaintiffs' retained records, including inconsistent payment figures, dates, settlement figures, and payoff-related figures. See Ex. B.1-B.3, Ex. E.1-E.4, Ex. G.1-G.4, Ex. I.1-I.2.

144. Plaintiffs further allege that PennyMac represented to the CFPB that Plaintiffs electronically signed an Affiliated Business Arrangement disclosure for Townsgate Closing Services on December 16, 2025, which Plaintiffs deny, and that a file offered in support of Defendant's account of the transaction bears an internal creation date months after the date it purports to represent, as alleged above.

145. Plaintiffs are informed and believe, and on that basis allege, that at the time PennyMac and its representatives made or conveyed the foregoing representations and omissions, they knew or should have known that the information being provided to Plaintiffs was incomplete, inconsistent, misleading, or did not accurately reflect the operative transaction terms later asserted against Plaintiffs.

146. Alternatively, PennyMac made such representations and omissions with reckless disregard for whether the information provided to Plaintiffs was accurate, complete, and consistent.

147. Plaintiffs did not know the true facts, including the final operative collateral terms later asserted, the final actual economic effect of the refinance, or the extent of the inconsistencies among the operative transaction records.

148. Plaintiffs reasonably relied on PennyMac's representations, omissions, instructions, and transaction documents in deciding to proceed with the refinance transaction, in bringing funds to closing, in accepting the transaction structure presented, and in acting on the payment instructions and timing conveyed to them.

149. Had Plaintiffs been timely provided the actual operative deed-of-trust language, the true collateral treatment being asserted, and accurate and consistent transaction terms, Plaintiffs would not have proceeded in the same manner and would have objected, delayed, refused, or sought legal review before closing.

150. Plaintiffs were damaged as a direct and proximate result of that reliance, including through disputed charges, loss of equity, clouded title, unreliable payoff and account treatment, credit harm, out-of-pocket loss, business interruption, loss of use and development opportunity, and other damages according to proof.

151. Plaintiffs further allege that PennyMac's post-closing conduct, including sending additional disclosure materials after recording, failing to produce all critical January 2026 call recordings, and maintaining or relying upon inconsistent portal and servicing records, supports Plaintiffs' allegation that the refinance transaction was not honestly, accurately, and fully presented to Plaintiffs before they were induced to proceed. See Ex. C.4, Ex. D.1-D.2, Ex. E.1-E.4, Ex. J.1-J.5.

152. By reason of the foregoing, Plaintiffs are entitled to recover all available damages and equitable relief according to proof.

## X. SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

### Against Defendants PennyMac Loan Services, LLC, and Does 1-20

153. Plaintiffs repeat and reallege paragraphs 1 through 152 as if fully set forth herein.

154. In the course of their business, professional, lending, settlement, title, escrow, brokerage, origination, servicing, and related activities, PennyMac and Doe Defendants supplied information to Plaintiffs for the guidance of Plaintiffs in business transactions.

155. Such information included representations and disclosures concerning closing dates, payment amounts, monthly-payment benefit, cash to close, escrow treatment, insurance corrections, payoff figures, payment timing, delinquency treatment, collateral scope, and related closing and servicing matters.

156. Defendants failed to exercise reasonable care or competence in obtaining, communicating, preserving, updating, or presenting that information.

157. Plaintiffs justifiably relied on such information in proceeding with the purchase, refinance, closing, payment, and post-closing decisions at issue.

158. Plaintiffs' reliance caused them pecuniary loss and other harm as alleged herein.

## XI. SEVENTH CAUSE OF ACTION

### Violation of Washington Consumer Protection Act, RCW 19.86

**Against Defendants PennyMac Loan Services, LLC, and Does 1-20**

159. Plaintiffs repeat and reallege paragraphs 1 through 158 as if fully set forth herein.

160. Defendants engaged in unfair or deceptive acts or practices in trade or commerce.

161. Such unfair or deceptive acts or practices include, without limitation:

a. providing inconsistent, altered, or misleading loan and settlement disclosures;

b. failing to provide operative collateral documents before closing;

c. presenting inconsistent refinance-benefit and payment representations;

d. maintaining unstable, incomplete, or unreliable portal records;

e. imposing or reporting disputed escrow, insurance, payoff, payment, and delinquency figures;

f. omitting critical January 2026 call recordings from production;

g. maintaining and asserting a disputed lien position affecting Parcel A;

h. representing that Plaintiffs signed an Affiliated Business Arrangement disclosure that Plaintiffs deny signing, and relying upon records bearing creation dates inconsistent with the dates they purport to represent; and

i. otherwise using records and transaction data in a manner likely to mislead reasonable consumers.

162. The acts and practices alleged herein occurred in trade or commerce.

163. The acts and practices alleged herein affect the public interest because they arise from standardized mortgage, settlement, title, servicing, escrow, and reporting practices capable of repetition and because similar conduct toward other consumers is possible or likely.

164. Plaintiffs suffered injury to their business or property, including monetary loss, title impairment, loss of use, credit harm, business interruption, and costs incurred to investigate and challenge Defendants' conduct.

165. Defendants' unfair or deceptive acts or practices were a proximate cause of Plaintiffs' injuries.

## XII. EIGHTH CAUSE OF ACTION

**Failure to Correct Servicing Errors / Failure to Provide Complete Information**

**Against Defendant PennyMac Loan Services, LLC, and Does 1-20**

166. Plaintiffs repeat and reallege paragraphs 1 through 165 as if fully set forth herein.

167. Plaintiffs disputed the account, collateral scope, payment treatment, payoff figures, escrow and insurance treatment, and related servicing matters, and requested information and records concerning those disputes. See Ex. J.1-J.2.

168. PennyMac had a duty to reasonably investigate disputed servicing matters, maintain accurate servicing records, and provide complete and accurate information responsive to Plaintiffs' requests and disputes.

169. PennyMac failed to provide a complete and reliable response. See Ex. J.1-J.2.

170. PennyMac omitted critical January 2026 call recordings and failed to provide complete, accurate, and reconcilable servicing information sufficient to verify the account history, payment application, payoff figures, escrow treatment, collateral assertions, and delinquency reporting at issue. See Ex. J.1-J.5, Ex. G.1-G.4, Ex. H.1-H.2, Ex. I.1-I.5.

171. PennyMac further maintained or relied upon inconsistent account records, portal content, payment-treatment entries, payoff figures, and reporting information. See Ex. E.1-E.4, Ex. G.1-G.4, Ex. H.1-H.2, Ex. I.1-I.5.

172. As a direct and proximate result, Plaintiffs suffered actual damages, including time and expense incurred in attempting to reconstruct the account, inability to verify loan and title status, continued credit and servicing harm, and interference with Plaintiffs' ability to protect their rights.

## XIII. NINTH CAUSE OF ACTION

### Slander of Title / Wrongful Cloud on Title

### Against Defendants PennyMac Loan Services, LLC, and Does 1-20

173. Plaintiffs repeat and reallege paragraphs 1 through 172 as if fully set forth herein.

174. Defendants caused to be recorded, maintained, asserted, or relied upon a deed of trust or lien claim affecting Parcel A under circumstances in which Plaintiffs did not knowingly consent to Parcel A being encumbered and in which the underlying collateral presentation and transaction records were materially inconsistent and disputed. See Ex. A.1-A.4, Ex. B.1-B.3, Ex. D.1-D.3, Ex. L.1-L.2.

175. Defendants knew or should have known that the asserted lien claim against Parcel A was disputed and that Plaintiffs challenged the validity, scope, and enforceability of that claim. See Ex. D.1-D.3, Ex. J.1-J.2.

176. The continued assertion and maintenance of that disputed lien has cast a cloud on Plaintiffs' title and interfered with Plaintiffs' ownership, marketability, use, financing, development, and disposition of Parcel A.

177. As a direct and proximate result, Plaintiffs have suffered damages including impairment of title, loss of use, delay, expense, and other damages according to proof.

## XIV. TENTH CAUSE OF ACTION

### Preservation of Evidence / Spoliation-Related Equitable Relief

### Against Defendants PennyMac Loan Services, LLC, and Does 1-20

178. Plaintiffs repeat and reallege paragraphs 1 through 177 as if fully set forth herein.

179. Defendants possess or control relevant evidence including portal records, metadata, audit trails, call recordings, servicing notes, internal communications, escrow ledgers, settlement ledgers, title and premium files, payoff calculations, version histories, upload logs, access logs, e-signature platform records and audit certificates, document generation logs, and other electronically stored information.

180. Plaintiffs have already observed portal lockouts, apparent changes in displayed records, and omissions from Defendants' production, including missing January 2026 call recordings, and have identified electronically produced records bearing internal creation dates months later than the dates those records purport to represent. See Ex. E.1-E.4, Ex. J.1-J.5.

181. There is a substantial risk that relevant evidence may be lost, altered, overwritten, deleted, concealed, or not preserved absent court intervention.

182. Such evidence is uniquely important because it bears directly on what documents existed when, what versions were shown to Plaintiffs, how the account and closing figures were handled, what representations were made to Plaintiffs, and whether Parcel A was knowingly and validly encumbered.

183. Plaintiffs have no adequate remedy at law to ensure preservation of this evidence without court-ordered relief.

## XV. DAMAGES

184. As a direct and proximate result of the foregoing acts and omissions, Plaintiffs have suffered actual, consequential, incidental, statutory, equitable, and continuing damages in amounts to be proven at trial.

185. Such damages include, without limitation, disputed charges, loss of equity, credit harm, title impairment, loss of use, business interruption, out-of-pocket loss, costs of investigation and reconstruction, and other damages according to proof.

186. Plaintiffs also seek costs, fees, and enhanced or statutory remedies wherever authorized by contract, statute, equity, or other applicable law.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For a declaration determining the true validity, scope, and enforceability of the disputed January 2026 refinance deed of trust;

B. For judgment quieting title and awarding related declaratory relief as to Parcel A, and such further title relief as the facts and proof warrant;

C. For temporary, preliminary, and permanent injunctive relief preventing enforcement activity on the disputed lien and requiring preservation of all relevant evidence;

D. For a full equitable accounting of the purchase and refinance transactions, including all escrow, payoff, insurance, commission, title, settlement, payment, suspense, and disbursement entries;

E. For actual, consequential, statutory, equitable, enhanced, and treble damages as allowed by law;

F. For attorney fees and costs where authorized;

G. For prejudgment and post-judgment interest as allowed by law; and

H. For such other and further relief as the Court deems just and proper.

## XVII. VERIFICATION

We, Randy A. Norberg and Alexanderia A. Norberg, declare under penalty of perjury under the laws of the State of Washington that we are the Plaintiffs in this action, that we have read the foregoing First Amended Verified Complaint, and that the facts stated therein are true and correct to the best of our knowledge, information, and belief.

DATED this 20th day of July, 2026, at 2:28pm, Washington.

Randy Norberg
Randy A. Norberg, Plaintiff, Pro Se

Alexanderia Norberg
Alexanderia A. Norberg, Plaintiff, Pro Se
14517 Macadam Rd S
Tukwila, WA 98168